## WALDIE v. STEERS SAND & GRAVEL CORPORATION et al.

## THE PORTCHESTER.

District Court, S. D. New York.

Jan. 27, 1944.

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan and John F. Quarto, of New York City, of counsel), for libellant.

Purdy & Lamb, of New York City, for respondent.

Burlingham, Veeder, Clark & Hupper, of New York City (Stanley R. Wright, of New York City, of counsel), for claimant-impleaded.

Kissam & Hayden, of New York City, (Joseph F. Murray, of New York City, of counsel), for respondent-impleaded Standard Surety & Casualty Co. of New York.

LEIBELL, District Judge.

Libellant, as owner of the scow "Hannah-Jeanette", brought this suit in admiralty against respondent, Steers Sand & Gravel Corporation, for damages sustained by the scow while under charter to the respondent. The respondent impleaded the tug "Portchester" owned by the Red Star Towing & Transportation Company (claimant-impleaded), and Yonkers Builders Supply Company (not served with process), Sol Lustbader, Inc. (also not served), and Standard Surety & Casualty Company of New York.

The tug "Portchester" towed the scow to the coal dock at Fort Slocum, David's Island, in the Long Island Sound off New Rochelle, on the night of May 17, 1939, at about flood tide and moored the scow, starboard side in, at the north side of the dock. When the tide went out during the night the scow went aground on a foul bottom and took a list to port. She lost part of her deck cargo of sand and gravel and became partly submerged. Libellant asserts that the tug captain selected the place at the dock where he moored the boat between 10 and 11 P.M., May 17th; that the deck hand of the tug assisted in putting out the lines as directed by the tug captain; that there was no one at the dock representing either the consignee, the Yonkers Builders Supply Company, or the contractor, Sol Lustbader, Inc.; that an army M. P. at the dock in answer to a question of the tug captain said it was all

right to leave the scow there; that the tug captain told the scow captain (bargee) that if he left plenty of slack in his lines he would be all right. Neither the tug captain nor the bargee made any soundings.

Respondent Steers admits that the scow was in good condition when received by it under charter from libellant only a few days before, on May 12, 1939. Steers contends however, that libellant's bargee did not properly attend to his lines, that his neglect caused the accident. Steers adds however, that if the accident was caused by the negligence of any one to whom Steers had entrusted the scow, that person should be held primarily liable and Steers only secondarily liable.

It appears that Steers had loaded the scow with 400 yards of gravel and 250 yards of sand at its plant at Point Eaton, Northport, Long Island, on May 15, 1939, pursuant to an order received from the Yonkers Builders Supply Company. The material was to be delivered at the dock at Fort Slocum, David's Island, where Sol Lustbader, Inc., had a contract for the construction of some buildings for the United States Army.

Standard Surety & Casualty Company of New York, another respondent, was the surety on the performance bond and on the payment of labor and materials bond, given by the contractor, Sol Lustbader, Inc., to the Government on this contract. It is the contention of the other respondents, Steers, Red Star and Yonkers, that Sol Lustbader, Inc., should have known and should have advised them of the true condition of the berth at the Fort Slocum dock and that Lustbader's responsibility is that of a wharfinger. Because Sol Lustbader, Inc., and the Yonkers Builders Supply Company might not be able to respond in damages, no effort was made to serve them with process although they were impleaded. Instead, Steers and Red Star endeavored to show that the Surety Company was the principal in the performance of this Government contract and that Sol Lustbader, Inc., was its agent, and that for any acts or negligence of Sol Lustbader, Inc., the Surety Company is liable. I shall take up this last point first.

The evidence shows that several months after the Surety Company had furnished its bonds (December 1938) the contractor, Sol Lustbader, Inc., received notice from the Government (April 3, 1939) to proceed with the work; that the contractor then notified the Surety Company that it would require financial assistance from the Surety to carry through the performance of the Fort Slocum contract. The contractor had been busy with another building job, the construction of a high school at Beacon, New York, and he had notified his surety on the Beacon job (National Surety Corporation) that he would probably sustain a loss there. Sol Lustbader, the president of the corporation bearing his name, expressed the opinion that he could make a profit on the Fort Slocum job sufficient to take care of the anticipated loss on the Beacon job. He said that he would require $10,000 or $15,000 to finance the Fort Slocum job, but that he expected to make a $35,000 profit on it.

Standard Surety Company wished to protect any money it advanced Sol Lustbader, Inc., towards the completion of the Fort Slocum job, so an agreement was entered into between them by which the Surety Company agreed to lend Sol Lustbader, Inc. up to $15,000. They agreed that a special account would be opened in the National City Bank designated as the "Sol Lustbader, Inc., Fort Slocum Account" and that in said account there should be deposited all advances from the Standard Surety Company and all moneys received as partial payments from the Government on this contract; that all bills for the payment of labor and material should be paid out of this account. In order to have some control over these disbursements, Earl D. McClary, a nominee of Standard Surety Company was elected Assistant Treasurer of Sol Lustbader, Inc., and all checks drawn on the account had to be signed by him and by the president, Sol Lustbader. Later Standard Surety itself countersigned all checks.

In like manner Sol Lustbader, Inc., agreed with National Surety to open a special account for the Beacon job, to be known as "Sol Lustbader, Inc. Beacon Account" in the Trust Company of North America, subject to the countersignature of the same nominee.

The shares of stock and minute book of Sol Lustbader, Inc., had been mislaid so new shares were issued, all to Sol Lustbader (President and Director) except qualifying shares to the two other directors, Anna Lustbader (who was also elected secretary) and Earl D. McClary, elected vice-president and assistant treasurer. The

587

shares of stock were endorsed in blank and delivered to Standard.

Prior to this arrangement most of the work had been sub-contracted for by Sol Lustbader, Inc., and materials had been ordered. That was true of the sand and gravel ordered by Sol Lustbader, Inc., from the Yonkers Builders Supply Co. A general arrangement for all such material required on this Fort Slocum job had been made between them and a price fixed.

■ The respondent Surety Company was not the undisclosed principal of Sol Lustbader, Inc., the contractor. Perkins et al. v. Huntington, 64 Hun 635, 19 N.Y.S. 71, affirmed 139 N.Y. 630, 35 N.E. 206. Nor was the Surety a partner of Sol Lustbader, Inc. Martin v. Peyton, 246 N.Y. 213, 158 N.E. 77.

Mr. Moore, a superintendent for Sol Lustbader, Inc., who had been so employed for some time, was in charge of the Fort Slocum job in April and May 1939. Sol Lustbader himself visited the job and gave directions and orders. All that the Surety Company controlled was the expenditure of the moneys it advanced and the payments received from the Government as the work progressed. Moore was paid out of these funds. Sol Lustbader, Inc., furnished plant and materials worth about $10,000.

At the time of the accident the Surety Company had given no orders to the Yonkers Company or Steers & Co. as to the delivery of the sand and gravel, the chartering of the scow, the hiring of the tug, the place of delivery, the dock, the condition of the bottom or as to anything else, which could in any way make it liable as a wharfinger. The libel is dismissed as against the Surety Company and all claims of the respondents against the Surety Company are likewise dismissed on the merits.

■ On the question of liability for mooring the scow at an unsafe berth, I hold that the tug "Portchester" and its owner, Red Star Towing & Transportation Company, were at fault and are primarily liable for the damage sustained by the scow. Respondent Steers is secondarily liable. The bargee had the right to rely on the statement of the tug captain that the scow would be all right at the place where the scow was moored, if the bargee left sufficient slack in the lines. The bargee followed those instructions. If the bottom of the Sound alongside the dock had been even instead of irregular, the scow would have rested safely on the bottom when the tide went out. The berth was selected by the tug captain. The deck hand of the tug under direction of the tug captain helped put out the lines. There was no obligation on the bargee to take soundings. There was no fault on the part of the bargee in not taking soundings—in making no investigation for himself. The Eastchester, 2 Cir., 20 F.2d 357; New York Trap Rock Corporation v. The Metropolitan No. 4, 2 Cir., 128 F.2d 831.

■ There was no one at the Fort Slocum dock when the tug "Portchester" brought the scow alongside the dock between 10 and 11 o'clock on the night of May 17th, except an army M. P. I find that neither Yonkers Builders nor Sol Lustbader, Inc., was notified by either Steers or Red Star that the scow would be delivered there that night. The army M. P. was not the representative of Yonkers or Sol Lustbader, Inc., either to receive the scow or give instructions as to where it should be moored. The army M. P. was only a guard, performing his duty as such at the dock in the interest of the United States Army.

It is not at all clear that the question the tug captain asked of the M. P. had anything to do with the safety of the bottom alongside the dock or the depth of the water. At the most it related to the question of permission—whether the army had any objection to the tug captain tieing up the scow there. If the tug captain was relying on the Army M. P. or his answer to the tug captain's question, as a source of reliable information which would justify the tug captain in assuming the berth was safe, then he was negligent in making any such assumption. It seems to me that the tug captain was relying on his own knowledge of those waters and of that dock and the berth. He said he had moored other boats there, some months before. A lot can happen at a berth in that time. Further, there was deep water at the end of the dock. The scow could have been moored there. Even the presence of a coal hopper and a derrick on the north side of the dock would not give rise to a presumption that it was a safe berth for this loaded scow brought in at flood tide. Low tide would be about 5:49 the next morning. No workman of the contractor could be expected at the dock at that hour. Under the circumstances, I believe that it was the

duty of the tug captain to take soundings before leaving the scow at this berth. His failure to do so was a fault that brought about the accident.

I have therefore concluded that the libel should be sustained, that the tug "Portchester" and its owner, Red Star Towing & Transportation Company, are primarily liable for the damage to the scow and that Steers Sand & Gravel Corporation is secondarily liable. The decree will cover the loss of the bargee's clothes and belongings. If the parties are unable to agree upon the amount of the damages a Commissioner will be named to ascertain and report the amount thereof. Submit interlocutory decree on two days' notice.